Island District Court to say this, that, you know, there's the requirement to find subject matter jurisdiction, and then there's the discretion the court has to abstain. And to the extent this court feels the need to get into the area of abstaining, this case seems like an ideal case to apply, given the circumstances. Right, I just, could you respond to what Mr. Kinney said, which is that we can do that without sending it back down to the district court? I believe you can, Your Honor, yes. Thank you, Your Honor. Thank you. Mr. Kinney? Just one point, Your Honor. I'd like to stress that the reason we are here is precisely because Niagara demanded defense and indemnity. Niagara didn't say, oh, there's no suit, so you don't have to worry about defending. They demanded defense and indemnity. They didn't say there's no indemnity. They demanded it. With that demand, they said it was reasonable to assume that Monsanto would sue Niagara. In fact, that was their stated basis for providing notice in the first place. So to the extent a practical likelihood analysis is required here, that alone satisfies it. Thank you, Your Honors. Thank you very much, Mr. Honaker, Mr. Kinney. All right, we'll reserve decision. We'll turn to USA versus Catholic Health Systems of Long Island. Mr. D'Antonio? Good afternoon, Your Honor. May it please the court. This is the first time I've ever had a chance to say this to this court, but this is truly a case of first impression. Relator's theory of liability is an implied false certification theory premised on an alleged violation of 42 U.S.C. 1320A. 7B4A, which is a criminal anti-conversion statute that, to our knowledge, has never been used as a vehicle to pursue civil recovery under the False Claims Act. The principal question before this court is whether a claim has been stated, and we respectfully submit that it has not, and the district court's order should be reversed and the claim should be dismissed. Is your argument that a reimbursement can never constitute a violation? I mean, in a situation like this, which is really a claim for reimbursement of past services, that it can't be a violation of this provision? No, Judge Sullivan, I don't think that's our argument. The facts that are before this court as pleaded are that the Catholic Health and St. Catherine of Siena Medical Center used the proceeds of reimbursement for services previously rendered, and without question were provided, to use for other purposes, other corporate purposes. I don't understand what it would mean. If you're getting reimbursed for past services, what restrictions would be on what you do with the reimbursed funds? I don't think there are any, and that's the point. Right, and so I'm trying to wonder when, in the case of reimbursement, would there ever be a cause of action for this provision? And I thought you just said, well, there could be. Well, I guess I didn't quite understand the court's question. I don't think under these circumstances there is ever a potential claim, because, in fact, once the payment is made, the money becomes Why does it really matter? Why does it really matter whether it is reimbursement or monies are given to you to be used for these purposes? Which is essentially what I think they are claiming. I don't think they're making the distinction between reimbursement and monies paid ahead of time. And it's your argument, essentially, that that isn't what this law is about. It is that the situation with payment of nursing homes is very likely, whether it's ahead of time or reimbursement, not to be correct. And that there are any number of things that Congress has set up to deal with, including back payments, anything of that sort, but that the one thing there is no indication of, that they want to bring in criminal law or even trouble damages for that. But just to open up this situation where these payments are almost always wrong in some way, is not something that we have any indication that Congress wanted to set up a criminal situation. Well, Judge Calabresi, I agree. I think the one point that I would make with regard to the fact that these payments are made retroactively, that is for services previously provided, is that Escobar requires that the alleged failure to disclose be material to the payment determination made by the governmental payers. And in these circumstances, there is no possible way that the allegation, which is essentially that Catholic Health failed to create a pool explicitly reserving for Medicare or Medicaid beneficiaries, the Medicare and Medicaid reimbursements. But isn't their claim go broader? Isn't their claim, and again, whether it's ahead of time or reimbursement, that these monies came in, that you knew that they were much more than what was due, and with a degree of knowledge that would occur in almost no other circumstances, chose to use these in a way that was improper. And that, they are saying, makes it a different case from the ordinary case of more money, the wrong money is paid and then used. Isn't that their claim? Well, that part of their claim, actually, Judge, was dismissed and is no longer part of the case. The claim that we were reimbursed at the so-called Bishop Sherman Episcopal Nursing Home Rate is no longer part of this case. So I think their allegation is that we failed to properly, their claim, properly segregate these monies for the exclusive benefit of the beneficiaries of the programs that we're talking about. And to Judge Sullivan's question, the answer is no. Once the payment is made, the money becomes the institution's money to do with as it chooses, as long as it's to a lawful purpose. And there's no allegation here that there was any sort of unlawful purpose. The corporate purposes to which these monies were put were for other missions that Catholic Health sponsors. And to that point, this isn't a mere theoretical argument or an accounting artifice. The fact is that institutions that are systems, networks that operate numerous missions, need to be able to move monies to support the missions when there's a particular initiative that needs to be pursued. The only issue that we have to be focused on in terms of patient care is providing the residents with the care that we are obligated to provide under the law. And that is separate and apart from the source of payment. In fact, that's been a conscious decision on the part of the State of New York to divorce the source of payment from the services provided under, or to be provided under Part 415. And there's no allegation we failed to provide those services to any resident at any time. I'm happy to answer additional questions that the court might have. And other than that, I think I've saved two minutes plus whatever time for rebuttal. You have indeed. Thank you, Judge. Mr. Kizer? Thank you, Your Honor. Let me begin with what seems to concern the court, which is the payment for past services. Let me describe how this actually works in the nursing home setting. The past services that are referred to here are used to create a reimbursement rate. So there's a compilation of past services, laboratory, radiology, and they come to a reimbursement rate. Then that reimbursement rate is used, is utilized to send money, federal dollars, into a nursing home account. And then the nursing home uses those funds to fund the health, required health services and other services for those nursing home residents. That's how it works. All Medicaid and Medicare program services. I'm sorry, Your Honor. I had a question, but I think Judge Calabresi was even ahead of me. Sure. I'm happy to answer. Judge Calabresi? Aren't you putting this law in a situation where even though these payments are almost always wrong and often are wrong excessively, that unless nursing homes take particular care, they will be subject not just to paying the money back, but to criminal penalties? Isn't that way beyond what the structure is? Absolutely not, Your Honor. You're claiming a broader one than I suggested, but that we're told was dismissed. Absolutely not, Your Honor. And the facts as they are described and detailed in this litigation aren't about nursing homes using money, perhaps that they were using it for this or for that. There was a calculated scheme in this case on these facts to charge the nursing home for costs that were fictitious, to charge the nursing home for costs that were five times, ten times what those services were supposed to cost. And, in fact, as we detail in the complaint, there's an email from among the most senior officials at the nursing home where he has conceded that not charging these services a fair market value are a violation. The matter that has been certified to us is an interpretation of the Conversion Act. And you are saying that we should interpret the Conversion Act to say that where such monies are used in such blatantly wrong factors, then the Conversion Act is violated? Is that your argument? Our argument is that if you take money that the federal government gives to you and entrust to you to take care of nursing home residents, and you in turn divert that money to other corporate purposes like giving large bonuses to CEOs, yes, that violates the statute. You're going too far, because these monies always come in and they're always wrong, and nursing homes are going to use them to do one thing or another which is close to patient care, and to bring in criminal law at that point would be a disaster. So your argument has to be much narrower than that. Well, the statute says, and I quote, if you take money from the federal government and you convert it for another intended use, not the use that the federal government gave you the money, then that violates the statute. But wait. But that's kind of the problem here. I mean, the use is that these monies are being used or are supposed to be used to reimburse the nursing home for services already provided, right? It's supposed to be used to provide medical services like laboratory, radiology. Your Honor. No, no. Here's the question. It's reimbursement for past services, yes or no? It's reimbursement for past services to create a reimbursement rate that then is used to wire money to a nursing home that the nursing home then uses and charges the nursing home. Look, if the nursing home thought, Your Honor, that all they had to do, that this was all nonsense, they could simply wire the money out of it. Money comes into the nursing home account. They could just wire out any amount that they want. They didn't do that. They engaged in the scheme. It seems to me that you are angry at the scheme. And you might have a basis for bringing a claim based on the scheme. But you've brought a claim based on the scheme under this particular statute. And you've got to stick to the language of the statute. And so you were sort of selectively quoting from it. But it's talking about receiving a benefit and having converted it away from the person for whom it was intended. Which is precisely and exactly what they did. How is that? Because the money was sitting in a nursing home account. And so if I may, Your Honor, if I may, the CHS officials involved created falsified invoices for laboratory services. Falsified invoices for radiology services. For past laboratory services, right? Falsified. For past laboratory services. No, Your Honor. For future laboratory services? Well, when the money came in, but that's the point, Your Honor. The money, the reimbursement rate for a nursing home may be created looking backwards at services that were provided. But then that million dollars or that $2 million or that $5 million that comes into the account. Then is accounted for as which services are you providing? What did they do here? They took a radiology, and they said, we're providing a radiology service for $1,000. It should cost $100. And in fact, their own internal musings over this are saying, yeah, that compliance tells us that's illegal. Compliance tells us we can't do that. Well, it may be illegal. The issue is whether it's a violation of this statute. Well, but they're doing it, Your Honor. If they wanted to take that money and convert it for building a swimming pool at corporate headquarters, and if all of this is true, taking this to its logical conclusion, they could simply take that money out of the nursing home and do whatever they want with it. They didn't do that. They went through this whole process of saying that EKG that should cost $10, we're going to charge you $1,000 for it. But there's no shortage of fraud statutes that you could use to bring a claim for this conduct. Well, this particular fraud statute says, was amended in 2010, Your Honor, to say that, so that there was no confusion, that this statute can be used in the health care, obviously in the health care industry, and may serve as the basis of a False Claims Act claim. It says it right in the statute, that this statute, violations of this statute can violate the FCA. That's the statute. And so what we're arguing here is that since the statute was specifically amended in 2010 to say it could be the basis of a False Claims Act claim, specifically, expressly, within the confines of the statute, we're saying that Judge Brody was absolutely correct. If you are engaging in a scheme to move money from the nursing home that was intended for the care of the residents to other parts of the organization, you are converting those funds that the federal government gave you for one purpose and one purpose only, to take care of the residents in that nursing home. They didn't do that. They used it as a piggy bank. I still have a terrible problem. A charge is made under a formula that is the old formula, and it gives too much money, more than was actually spent, you allege, to care for these patients. What are these people to do then? Are they to give back? Can they wait until the government says this is too high a formula? Or are they subject to criminal penalties under your very narrow reading of this conversion statute so that it is a violation of a conversion statute and therefore should be brought to a federal court for a claim? Well, Your Honor, I would just very briefly respectfully disagree with giving too much money to the nursing home. Nursing homes are probably the single industry, more than any other, that never has enough money to adequately take care of its nursing home residents. They are always short of money. I know this not just from this case, but from many other kinds of work that I do. So every single dollar that is in a nursing home account can be used to take care of the residents. And when Catholic Health Center says we're going to fabricate charges, we're going to say we provided these services when we didn't,  because, yes, I think that is a clear violation of the statute, as Judge Brody correctly ruled. And, in fact, and I'll repeat, the statute, so that there was no confusion on this, the statute was amended in 2010 to say it should serve as the basis of a False Claims Act claim. I'm not saying it can't be a False Claims Act claim. I think the issue is whether the facts that you've alleged fit this statute for purposes of conversion. And you seem to be just dancing past the facts here to say that the end result was something improper happened. Well, my final point on that, Your Honor, is that, number one, 99 percent of the time in Medicare and Medicaid cases, you're talking about reimbursement for past services. That's just the way it works. But if you make representations in order to get that money that are false, then you have a problem. The implied false certification here on these facts was that they claimed they were in compliance with this statute. So when they went and made those for the past services, they kept saying we're in compliance, we're in compliance, and a la Escobar, they weren't in compliance because they were violating this particular statute. That was the false representation that they made, the implied false representation that they made in the context of these claims. So whether it was past services or- In the context of these claims, again, that's a term I think you used in your briefs as well, but there has to be some causal connection, right? Well, the causal connection, Your Honor, is that when they're asking for reimbursement for these services, they are saying impliedly to the government, if you're talking about, even if they're talking about past services, that we are complying with this statute, 42 U.S.C. 1340. We're in compliance with the statute, but they weren't in compliance with the statute because every month they were charging the nursing home all of these false charges. And I could tell you that the consequence of that, if that is where the court is leaning, and we'll go on this, then it will be open season in nursing homes. They will be rated. They will love that result because then they don't have to go through what CHS went through. They won't have to go through creating false invoices and overcharging and concealing it. They'll just wire whatever the hell they want out of the nursing home. You're unfamiliar with sort of criminal fraud statutes and other statutes that- But, Your Honor, you're saying that that would be fraudulent. If you're saying what I'm describing would be fraudulent- I think what we're saying is that you pled this wrong and that there are consequences to that. That's really, I think, the point at least I'm asking you to consider. And you keep coming back to the sort of unjust nature of the consequences here. Well, I would repeat, Your Honor, if this is the fraud statute that could be leaned on and relied upon to hold CHS and organizations like that to account. So if, in fact, that is fraudulent because of what Your Honors are describing as payment of care services and all the rest, if those are the arguments that are being relied upon, then there's no fraud scheme or theory that will account for it any better than this particular statute that is right on point and says that the False Claims Act- It could be the basis of an implied false certification False Claims Act claim. And if that's the case, if that's the signal to the industry that I know from looking at this case and all the other work I do in this, is that they will say, Okay, well, there aren't any safeguards. I don't have to charge five times for a lab. I don't have to charge a lot of weight. When we have a need, I'll just siphon a million dollars out of the nursing home account. That's the point of this statute, and that's why it should be applicable to this case, to hold operators like CHS accountable that they are spending the money that was entrusted to them by the government for the nursing home residents that live in that facility. Well, Mr. Kaiser, let me ask the simplest possible question in respect to what you're arguing. In deciding whether or not to award Medicare and Medicaid reimbursements to medical facilities, does the government, in fact, ask how that money will be spent in the future? Do they ask that question separately? When you say the government, you mean like the bureaucrats responsible for monies? I don't know, Your Honor. I don't know if that question is asked by them. I don't know. It would be rather fundamental, right? Well, I think that the government, I believe that's why there are statutes like this. The government decides to award Medicare and Medicaid reimbursements to medical facilities, right? We can agree on that much. Right. When it does that, does the government ask how that money will be spent in the future? The government asks that to the extent that there's a fiduciary relationship between, well, if you're asking me whether there's an express writing somewhere, what I'm saying is that, like any other government money that is entrusted to a private player, Your Honor, they didn't give the money to the U.S. My question is extremely simple. Does the government ask how that money will be spent in the future? The government asks. Let me put it a different way. Does the government simply set up a formula and use that formula? And if a formula is wrong, then come back and say the formula is wrong and you must refund that without asking how you, what you do with the money we have given you under the formula then in place? Well, the government does. Yeah, well, Your Honor, I keep saying the same thing. The government does ask that question. The government asks that question in the context of a felony statute that's undergirding this decision. They say any time we give money to a private player, any time we do it, and we're entrusting it to you for a particular purpose and you use it for another purpose, yes, that's asking them that this money be spent for the residents in the nursing home. They are demanding that. They're demanding, the federal government is demanding that the money we give to you is spent for these nursing home residents. All right, thank you, Mr. Cabranes. Thank you. You've taken some extra minutes, but we're delighted to have heard from you. Mr. D'Antonio? Judge Cabranes, let me actually start with the question that you asked. It is a simple question and there's a simple answer. No, government doesn't ask that question. There is no statute, there is no regulation, there is no reimbursement guideline where the government asks for a representation, implicit or explicit, as to how the money will be spent. The government, Medicare and Medicaid, typically look to three things prior to making a reimbursement decision for a claim that's been submitted. One, is the resident a program beneficiary? Two, are you participating in the program? Are you a Medicare or Medicaid participant? And three, have the services been provided? That's it. And that was the point we made repeatedly in the briefs. I don't need to belabor that. You surely are not saying that if monies are given and then the nursing home uses it to take trips to some beautiful island somewhere, that that would be a violation, even though there is not a specific statement as to how the monies would be spent. No, Judge Calabresi, absolutely not. I'm not making that claim. But I was answering Judge Cabranes' question about whether the government asks for a prior representation. If, in fact, the nursing home took the monies and used them for an illegal or improper purpose, as Judge Sullivan has indicated, there are numerous fraud statutes that would kick in and would provide for both civil and criminal liability. That's not what happened here. That is not this case. This case involves a nursing home that is not even an independent legal entity. It is part and parcel of St. Catherine of Siena Medical Center. And so with all of this, and again, I think that there were some liberties taken with the facts that actually were pleaded. There were no invented invoices here. This is a situation where the medical center set a rate for services it provided to its own department. It's an internal process that was not inappropriate and didn't violate any of the Medicare or Medicaid cost-finding principles. And I'm a little over my time, but can I just complete this one thought, please? When Mr. Kaiser indicates that these inflated charges somehow impacted the rate that the government paid for services, he knows that's not correct. In fact, if you look at the Medicaid reimbursement process, they use a base year, and the base year for virtually every year at issue here was 2002. The relator did not come to St. Catherine of Siena until 2007, and he doesn't make any allegation except for between the periods of 2007 and 2011, if you look at the complaint. None of those periods are base years for the years at issue. So this did not result in the government paying one thing dime more, even if there had been an improper allocation of costs, and there wasn't. Thank you. I appreciate the time. Thank you, Mr. D'Antonio. We'll reserve the decision. Thank you.